

AO 106 (Rev. 04/10) Application for a Search Warrant

**SEALED**

# UNITED STATES DISTRICT COURT

for the

Southern District of West Virginia

SEALED

| In the Matter of the Search of | )  |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| 1438 Lynn Street | ) |
| Huntington, West Virginia | ) |

Case No.   3:18-mj-00031

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____Southern_____ District of _____West Virginia_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Section 846 | Conspiracy to distribute controlled substances |
| 21 USC Section 841(a)(1) | Distribution of controlled substances |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Charles E. Irwin, Special Drug Enforcement Administration
*Printed name and title*

Sworn to before me and signed in my presence.

Date: April 16, 2018

_____
*Judge's signature*

City and state:   Huntington, West Virginia

Cheryl A. Eifert, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

The property to be searched is the single family, one story residence located at 1438 Lynn Street Huntington, West Virginia, which is described as a single family, one story residence with a dark composite roof, gray vinyl siding, a white front door with two windows on the front face of the residence.  The windows have white trim and the house has a covered front porch with wooden railings.  There is a concrete walkway that leads from the road to the front porch with wooden stairs allowing access to the front porch and front door.  The residence is also pictured below:

Photo taken on 4/10/18:



## ATTACHMENT B

### Particular Things to be Seized

1.  Log books, notes, records, customer lists, ledgers, and other papers and property relating to the transportation, ordering, purchasing, processing, storage, and distribution of controlled substances, including but not limited to heroin.

2.  Receipts and other items related to money wire transfers and evidence of the transfer or concealment of money.

3.  Cellular telephones and electronic devices believed to be used to facilitate drug trafficking.

4.  United States currency and other financial instruments.

5.  Photographs of assets, narcotics, or co-conspirators.

6.  The opening, search and removal, if necessary, of any safes or any locked receptacle or compartment, as items described in this attachment could be maintained within.

7.  Any papers or items indicating occupancy, residency, or rental.

8.  Drug paraphernalia and equipment, related to the sale, manufacture, processing and storage of controlled substances, including but not limited to scales, cutting agents, and packaging materials.

9.  All firearms and ammunition.

10.  Controlled substances including but not limited to heroin, fentanyl, and cocaine.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>1438 Lynn Street<br>Huntington, West Virginia | Case No. 3:18-mj-00031<br><br>Filed Under Seal |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Charles E. Irwin, being first duly sworn on oath, depose and say:

### I.    INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. Section 2703(c)(1)(A) for the residence at 1438 Lynn Street, Huntington, West Virginia.  The target residence is described herein and in Attachment A, and the items to be seized are described herein and in Attachment B.

2.    I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7).  Specifically, I am a Special Agent with the Drug Enforcement Administration ("DEA"), assigned to the Charleston, WV District Office.  In that capacity, I investigate violations of the Controlled Substances Act (Title 21, United States Code, Section 801, et seq.).  I have been employed as a Special Agent with the DEA since July 2014.  Prior to becoming a Special Agent, I served with the Durham Police Department as a police officer and

investigator.   In my experience as a law enforcement officer, I have participated in numerous narcotics investigations, during the course of which I have participated in physical surveillance, undercover operations, and executions of search warrants.

3.   I have completed the DEA Basic Agent Training Course as well as other training courses related to gangs and narcotics trafficking.   I have participated in narcotics investigations at both the local and federal level, and I have participated in numerous federal search warrants.   As a result, I have become familiar with methods of operation of drug traffickers and organizations.   As a Special Agent with the DEA, I have the responsibility of working with other federal and state law enforcement officers in investigations of violations of federal and state controlled substance laws, including the investigation of heroin, cocaine, methylenedioxymethamphetamine (MDMA), methamphetamine, marijuana and other dangerous drug organizations.

4.   I have participated in the debriefing of defendants, witnesses, and informants, during which time I have discussed with them their methods of drug smuggling, distribution, packaging, trafficking, avoiding law enforcement, and laundering proceeds, among other concerns related to drug trafficking.   I have discussed and learned from other law enforcement investigators in regards to these matters as well.

5.   Based on my training, experience and conversations with other experienced narcotics investigators, I have gained experience in the techniques and methods used by drug traffickers to distribute controlled substances, their use of cellular phones and other electronic communication devices to facilitate their trafficking activity, and the methods used to conceal and launder the proceeds of said activity.

6.   Through my involvement as co-case agent in a federal Title III investigation, I have gained experience in that investigation involving the interception of wire communications. I have been directly involved in the review and deciphering of intercepted coded conversations between narcotics traffickers that were later corroborated by surveillance.   Throughout my law enforcement career, I have spoken with, worked with, and gained knowledge from numerous experienced federal, state, and local narcotics officers about drug traffickers and their use of cell phones to facilitate drug trafficking by, for example, using code during their conversations.   I have also received extensive instruction and practical training on intercepting communications and conducting coordinated surveillance while at the DEA Academy.

7.   Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. Section 841 (a)(1) have been committed, are being committed, and will be committed by Manget PETERSON, Michael WATSON and/or additional

known and unknown persons.  There is also probable cause to believe that items described in Attachment B are being maintained in the target residence and constitute evidence of these criminal violations.

8.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  I have not included every fact concerning this investigation.  This affidavit is intended to show merely that there is a sufficient factual basis for a fair determination of probable cause to support the Application.

## II.  PURPOSE OF THIS AFFIDAVIT

9.    As described herein, there is probable cause to believe that the following offenses have been committed, and are being committed, by Manget PETERSON, Willie PETERSON, Michael "Red" WATSON (hereinafter, "WATSON") and others known and unknown, as described herein:

a.  Distribution of, and possession with intent to distribute, controlled substances, to include heroin, in violation of 21 U.S.C. § 841(a)(1);

b.  Conspiracy to distribute, and to possess with the intent to distribute, controlled substances, to include heroin, cocaine, and methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846; and

c.   Use   of   communications   facilities   to   commit, facilitate,   or   further   the   above-listed   offenses,   in violation of 21 U.S.C. § 843(b).

10.   This affidavit is submitted in support of an application for a search warrant, all with respect to the following **Target Residence** which is further described in Attachment A, for evidence, fruits, and instrumentalities, as further described in Attachment B, of violations of the above listed statutes, committed by WATSON and others, as described herein.

11.   1438 Lynn Street Huntington, West Virginia, which is described as a single family, one story residence with a dark composite roof, gray vinyl siding, a white front door with two windows on the front face of the residence.  The windows have white trim and the house has a covered front porch with wooden railings. Here is a concrete walkway that leads from the road to the front porch with wooden stairs allowing access to the front porch and front door.   The **Target Residence** is also pictured in Attachment A.

### III. SOURCES OF INFORMATION

12.   I have obtained the facts set forth in this Affidavit through personal participation in the investigation, from oral and written reports of other law enforcement officers, from records, documents and other evidence obtained during this investigation, from confidential sources and sources of information who are

associated with, and knowledgeable about, the subjects of this investigation and their confederates, and from other sources of information as referenced herein. I have reviewed official reports prepared by other law enforcement officers participating in this investigation and in the other related investigations by agencies referenced in this Affidavit.

13. During this investigation we have monitored and/or recorded conversations between Confidential Sources and targets of this investigation. These conversations have been conducted in English. When I refer to these conversations in this affidavit, I am relying on summary translations that have been provided to me by investigators who are familiar and have worked extensively on this investigation or I have myself listened to the recorded conversations.

14. On January 16, 2018, U.S. District Judge Robert C. Chambers signed an order authorizing the interception of wire and electronic communications to/from three phones used by PETERSON, namely (304) 962-5007 (referred to as "TT1"); (313) 737-8714 (referred to as "TT5"); and (304) 942-4638 (referred to as "TT6"). In this affidavit, I refer to intercepted communications to and from (313) 737-8714 (TT5) and (304) 942-4638 (TT6). These communications occurred in English and I am relying on summaries and/or transcripts that have been prepared either by myself or by investigators that have worked extensively on this investigation.

## IV.   PROBABLE CAUSE

15.   This investigation is being conducted by DEA Charleston, West Virginia State Police ("WVSP"), and DEA Detroit.   This investigation began after investigators debriefed a WVSP confidential source (hereinafter "CS1[1]") who offered to make a controlled purchase of heroin from an individual CS1 knew as "Money", who was distributing heroin in the Huntington, WV, area. Investigators showed CS1 a photo of PETERSON and CS1 identified PETERSON as "Money".   During October and November, 2017, investigators utilized CS1 to make multiple controlled purchases of various amounts of heroin from PETERSON ranging from one gram to one ounce.   These controlled purchases occurred on October 13, 2017; October 26, 2017; November 14, 2017; November 28, 2017; and November 30, 2017.   On the November 30, 2017 controlled purchase, PETERSON directed SYKES to sell an ounce.   The phone calls between CS1 and PETERSON to arrange these controlled purchases were recorded and the controlled purchases were also audio and video recorded.

---

[1] CS1 is signed up as a cooperating source with West Virginia State Police.  CS1 is cooperating for monetary benefits.  CS1 has prior arrests and/or convictions for theft, grand larceny, shoplifting, receiving stolen property, possession of counterfeit money, possession of controlled substance, fugitive from justice, issuing worthless check, domestic battery, contributing to the delinquency of a minor, battery, petit larceny, and assault.  CS1 has a history of substance abuse and is a heroin addict.  CS1 has provided credible information that has been independently verified by investigators.  Investigators believe CS1 to be a reliable source of information.

16.  Investigators ultimately obtained court authorization, on January 16, 2018, to intercept the wire and electronic communications to and from three phones used by PETERSON, namely (304) 962-5007 (TT1); (313) 737-8714 (TT5); and (304) 942-4638 (TT6).

17.  Investigators began interception on January 17, 2018, and interception has confirmed that PETERSON is using (313) 737-8714 (TT5) and (304) 942-4638 (TT6) to facilitate his drug trafficking activities.  Investigators were informed by Verizon that (304) 962-5007 (TT1) was suspended due to nonpayment and to date, no wire or electronic data has been intercepted to/from (304) 962-5007 (TT1).

18.  Interception confirmed that Manget PETERSON is supplied with drugs by his brother Willie PETERSON, in Detroit, Michigan. In one particular intercepted call between Manget PETERSON and Willie PETERON, discussed below, Manget PETERSON bemoaned that he had received poor quality heroin.  During that call, Manget PETERSON remarked that other people received higher quality drugs, to include "Mook" (whom we know to be Luther PETERSON) and "Red" (whom as discussed herein we identified as WATSON).  This call illustrated the drug trafficking organization that Manget PETERSON worked for; one in which he was a re-distributor and his brother, Willie PETERSON was the chief supplier.  Furthermore the reference to others receiving better heroin, namely "Red," indicated that

there were other heroin re-distributors in the Huntington, West Virginia area similar to Manget PETERSON who also worked for Willie PETERSON.

19.   As the T-III portion of our investigation progressed, we continued to hear mention of an individual known as "Red".   On January 24, 2018, as discussed in more detail below, we intercepted a call where an individual using (304) 730-8780 complained about the quality of his drugs and asked Manget PETERSON for help selling the drugs.   The next day, Manget PETERSON called Willie PETERSON and remarked that the prior day, "Red" had called complaining about the heroin and asked for Manget PETERSON's help in selling the drugs.   The conversation Manget PETERSON relayed to Willie PETERSON was the same conversation that the user of (304) 730-8780 had with Manget PETERSON, indicating that "Red" is the user of (304) 730-8780.

20.   On January 26, 2018, investigators received court authorization to track the GPS location of (304) 730-8780.   GPS pings revealed that the user of (304) 730-8780, believed to be "Red", spent the majority of his time at 1438 Lynn Street, Huntington, West Virginia (**Target Residence**).   On January 30, 2018, investigators conducted surveillance in the area of 1438 Lynn Street, Huntington, West Virginia (**Target Residence**) and followed the GPS pings of (304) 730-8780 as the phone moved to a residence down the road.   Investigators were able to identify the vehicle

driven by the user of (304) 730-8780, a gray BMW 7 Series that is actually registered to a relative of Manget PETERSON and registered to Manget PETERSON's residence, 527 Hal Greer Boulevard, Huntington, West Virginia.   After a brief stay at this nearby residence, investigators observed a lone individual get into the gray BMW and drive away.   The next GPS ping for (304) 730-8780 confirmed that the user of (304) 730-8780 had indeed departed in the gray BMW 7 series.   Investigators conducted a traffic stop and identified the lone individual as Michael WATSON, believed now to be the user of (304) 730-8780.   Furthermore, additional surveillance and GPS tracking of WATSON's phone confirmed that WATSON resides at the above listed **Target Residence**.

A.    **Identification of WATSON as the user of (304) 730-8780**

21.   On January 19, 2018, at approximately 1:23 p.m., Manget PETERSON, (313) 737-8714 (TT5), received a call (#115) from Willie PETERSON, (313) 205-9544.   Prior to this call, Manget PETERSON had received multiple calls from his heroin customers where they complained about the quality of his heroin.   During the call, Willie PETERSON asked how things were going down there and Manget PETERSON said that his stuff, "it aint got no legs."   Manget PETERSON continued to say that "Mook" and "Red" got the "fire" but Manget got some, "gray shit."   Willie PETERSON was displeased and lamented at the fact that he was now going to owe his supplier for bad drugs.

22.   Based on my training and experience, and that of those around me, I believe that in the above detailed call Manget PETERSON had received poor quality heroin, which he told Willie PETERSON, "didn't have any legs" meaning it was hard to get rid of, or sell, the heroin.   More importantly, Manget PETERSON remarked that other individuals, "Mook" and "Red", got "Fire", which is a common code for high purity heroin.   This call outlined Manget PETERSON's organization and made it clear that other individuals were also supplied by Willie PETERSON, one of whom went by the moniker, "Red."

23.   A couple days later, on January 24, 2018, at approximately 5:18 p.m., Manget PETERSON, (304) 942-4638 (TT6), placed a call (#1559) to (304) 730-8780, the user of which as discussed herein was identified as WATSON.   During the call WATSON said he was having trouble getting ahold of Manget PETERSON's brother, Willie PETERSON.   WATSON then said, "I need your help, this shit aint going so fast for me."   Manget replied that it had also been slow for him.   Manget then said that he had a customer that was looking to get "fifteen" but that wouldn't be until 8:00 p.m. when the customer got off work.   Manget PETERSON said that the customer was looking for stuff that had "chunks" in it.   WATSON said, "I got it" and Manget PETERSON said he would let WATSON know when he talked to the customer.   After a brief conversation regarding the death of Huntington's Police Chief, Manget PETERSON

asked WATSON what color his stuff was.  WATSON replied that it was, "brown" but that he, "hadn't been paying attention to it." Manget PETERSON said he would talk to a friend that had some, "new shit."  WATSON asked Manget PETERSON to tell Willie PETERSON to call him and the call ended.

24.  Based on my training and experience, and that of those around me, I believe that the in the above detailed call, Manget PETERSON talked with WATSON about how they were both having trouble selling their heroin.  WATSON asked for help and Manget PETERSON said he had a customer that wanted "fifteen" indicating that Manget PETERSON may be willing to pass the customer to WATSON.  Manget PETERSON asked if WATSON had stuff with "chunks" in it, referring to chunky heroin, which is I know to be desirable among some heroin users in Huntington, West Virginia.  Manget PETERSON also asked WATSON what color his heroin was and WATSON said it was "brown" which, quite plainly, is the color of heroin.

25.  Minutes later, at approximately 5:23 p.m., Manget PETERSON, (313) 737-8714 (TT5), placed a call (#642) to Willie PETERSON, (313) 205-9544.  During the call Manget PETERSON said that "Red" was trying to get in touch with Willie PETERSON.  This suggests that the user of (304) 730-8780, whom we identified as WATSON, is also the individual that goes by "Red."

26.  Further confirming this belief, the following day Manget PETERSON, (313) 737-8714 (TT5), received a call (#701) from Willie

PETERSON, (313) 205-9544.  During the call, Manget PETERSON said that yesterday "Red" called Manget PETERSON and asked for help because "Red's" "shit" wasn't moving.  Again, Manget PETERSON is relaying the conversation that he had the prior day with the user of (304) 730-8780, whom we identified as WATSON, further confirming that "Red" is WATSON and the user of (304) 730-8780.

27.  On January 26, 2018, investigators received court authorization to track the GPS location of (304) 730-8780.  GPS location revealed that the user of (304) 730-8780 spent almost the entirety of the day at 1438 Lynn Street, Huntington, West Virginia (**Target Residence**).  On January 30, 2018, investigators were conducting surveillance in Huntington, West Virginia, and received a GPS ping which indicted the user of (304) 730-8780 was located at 1650 Charleston Ave Huntington, West Virginia.  Investigators moved to the area and noticed a gray BMW 7 Series, which was typically parked at 1438 Lynn Street, Huntington, West Virginia (**Target Residence**), was now parked in front of 1650 Charleston, Huntington, West Virginia.  Furthermore, this BMW 7 Series had a listed registration address of Manget PETERSON's residence, 527 Hal Greer Boulevard, Huntington, West Virginia.  Investigators established surveillance at 1650 Charleston Ave and received multiple GPS pings that confirmed the user of (304) 730-8780 was in the residence.  A short time later, investigators observed a lone individual walk out of 1650 Charleston Ave and get into the

gray BMW 7 Series.  As the BMW drove away investigators conducted a traffic stop in order to identify the driver.  While the traffic stop was ongoing the GPS location of (304) 730-8780 moved from 1650 Charleston Ave to the location where the BMW was stopped, further confirming the user of (304) 730-8780 was driving the BMW. As a result of the traffic stop, the driver of the BMW was identified as Michel WATSON.  After the traffic stop concluded, WATSON was released and investigators continued to follow him as he drove directly to 1438 Lynn Street, Huntington, West Virginia (**Target Residence**).  There, investigators watched WATSON get out of the BMW and walk into the **Target Residence**.

28.  Investigators believe the above detailed calls show that the user of (304) 730-8780, sometimes referred to as "Red," is engaged in selling heroin with Manget PETERSON and Willie PETERSON. Additionally, based on the GPS pings from (304) 730-8780 and the coordinated surveillance and traffic stop, we believe that the user of (304) 730-8780, "Red," is WATSON.  Investigators have since received approximately 45 days of GPS location data which confirm that WATSON spends the majority of his time at his residence, 1438 Lynn Street, Huntington, West Virginia (**Target Residence**).

B.    **Identification of WATSON's Residence, 1438 Lynn Street, Huntington, West Virginia (Target Residence)**

29.  As discussed above, investigators obtained court authorization to track the GPS location of WATSON's phone, (304)

730-8780.   The GPS location data reveals that WATSON lives and spends the majority of his day at the **Target Residence**. Additionally, we have conducted numerous surveillance checks at the **Target Residence** and regularly observe WATSON's gray BMW 7 Series parked in front of the residence.   Most recently, on April 10, 2018, investigators drove by the **Target Residence** and observed WATSON and another individual get out of the BMW 7 Series and walk into the **Target Residence**.

### V.   KNOWLEDGE BASED ON TRAINING AND EXPERIENCE

30.  Based upon my training and experience, and my discussions with other experienced officers and agents experienced in drug investigations, I know the following:

a.   During the execution of search warrants, it is common to find papers, letters, billings, documents, and other writings that show ownership, dominion, and control of vehicles, residences, and/or storage units.

b.   It is common for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their vehicles, residences, and/or storage units for their ready access and to conceal them from law enforcement.

c.   Narcotics traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale,

and distribution of controlled substances. Narcotics traffickers commonly "front," that is, provide on consignment, controlled substances to their clients. These books, records, receipts, notes, and ledgers, commonly known as "pay and owe sheets," are maintained where traffickers have ready access to them.

d.   Traffickers of controlled substances, and those who assist them, maintain and tend to retain accounts or records of their drug trafficking activities, including lists of drug quantities and money owed, telephone records including contact names and numbers, photographs, and similar records of evidentiary value. These items are generally kept in locations where drug traffickers believe their property is secure and will remain undetected from law enforcement, such as inside their homes and vehicles. Sometimes, these locations are not their primary residence, but instead used for the purposes of storing and distributing drugs.

e.   Traffickers of controlled substances commonly maintain records reflecting names or nicknames, addresses, vehicles, and/or telephone numbers of their suppliers, customers and associates in the trafficking organization. Traffickers commonly maintain this information in books or papers as well as in cellular telephones and other electronic devices. Traffickers often maintain cellular telephones for

ready access to their clientele and to maintain their ongoing narcotics business. Traffickers frequently change their cellular telephone numbers to avoid detection by law enforcement, and it is common for traffickers to use more than one cellular telephone at any one time.

f. Traffickers maintain evidence of their criminal activity at locations that are convenient to them, including their residences and vehicles. This evidence often includes more than contraband and paraphernalia and includes financial records, records of property and vehicle ownership, records of property rented, records of storage facilities used to hide drugs or currency, and other documentary evidence relating to commission of, and proceeds from, their crimes. Narcotics traffickers sometimes take or cause to be taken photographs and/or video recordings of themselves, their associates, their property, and their illegal product, or have photo or video security systems that record images from their homes or property. These individuals usually maintain these photographs and recordings in their possession or at their premises, in a safe place. Such evidence may be kept at a safe location for a long time after the drug deal(s) to which they pertain are completed, if the location remains under the control of the trafficker.

g.    Traffickers frequently maintain items necessary for weighing, packaging and cutting drugs for distribution.  This paraphernalia often includes, but is not limited to, scales, plastic bags and other packaging materials, sifters, containers, and cutting/diluting agents and items to mask the odor of narcotics.  Persons trafficking and using controlled substances frequently sell more than one type of controlled substance at any one time.

h.    It is common for drug dealers to also be users of their product, and it is common for drug users to maintain paraphernalia associated with the use of controlled substances, such as syringes, pipes, spoons, containers, straws, and razor blades.

i.    Traffickers frequently maintain records, books, notes, ledgers, travel documents, and other papers relating to the transportation and distribution of controlled substances in locations convenient to them, such as their residences and vehicles.

j.    Traffickers often maintain weapons, including firearms and ammunition, in secure locations such as their residences and vehicles, in order to protect their drugs and drug proceeds.

k.    Traffickers often have false identification documents and identification documents in the names of

others.    Trafficggers  very  often  place  assets  in  names  other
than  their  own,  or  use  fictitious  names  and  identification,
to  avoid  detection  of  these  assets  by  government  agencies,
while  continuing  to  use  these  assets  and  exercise  dominion
and  control  over  them.

l.    Drug  trafficking  is  a  cash  business,  and  in  order
to  escape  notice  from  authorities  for  using  unexplained
income,  or  hide  excessive  cash  from  illegal  activities,
traffickers  either  keep  large  quantities  of  cash  at  home  or
other  secure  locations,  such  as  safe  deposit  boxes,  or  convert
the  cash  into  other  valuable  assets,  such  as  jewelry,  precious
metals,  monetary  instruments,  or  other  negotiable  forms  of
wealth.    Records  of  such  conversions  are  often  stored  where
a  trafficker  lives.

m.    A  common  method  that  drug  traffickers  use  to
distribute  drugs  is  through  the  use  of  passenger  vehicles.
Similarly,  the  proceeds  of  the  sales  of  drugs  are  sometimes
transported  back  in  the  same  manner.    Vehicles  used  by  drug
traffickers  are  often  placed  in  fictitious  or  nominee  names,
and  outfitted  with  concealed  compartments  where  the  drugs  and
drug  proceeds  can  be  hidden  to  lessen  the  likelihood  of
interdiction.

n.    Persons  involved  in  drug  trafficking  conceal  in
their  residences  caches  of  drugs,  large  amounts  of  currency,

financial instructions, precious metals, jewelry, and other items of value and/or proceeds of drug transactions as well as evidence of financial transactions relating to obtaining, transferring, secreting, or the spending of large sums of money made from engaging in narcotics trafficking activities.

o.   Unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

p.   Illegal drug trafficking is a continuing activity over months and even years.  Illegal drug traffickers will repeatedly obtain and distribute controlled substances on a somewhat regular basis, much as any distributor of a legitimate commodity would purchase stock for sale, and, similarly, drug traffickers will have an "inventory," which fluctuates in size depending upon various factors, including the demand and supply for the product.  I would expect the trafficker to keep records of his illegal activities for a period of time extending beyond the time during which he actually possesses illegal controlled substances, in order that he can maintain contact with his criminal associates for future drug transactions, and so that he can have records of prior transactions for which, for example, he might still be owed money, or might owe someone else money.  These records are often created in code.

31.   Based on my training and experience, and that of those
around me, I also know that drug dealers use cellular telephones
as a tool or instrumentality in committing their criminal activity,
to include laundering their proceeds.   They use them to maintain
contact with their suppliers, distributors, and customers.   They
prefer cellular telephones because, first, they can be purchased
without the location and personal information that land lines
require.   Second, they can be easily carried to permit the user
maximum flexibility in meeting associates, avoiding police
surveillance, and traveling to obtain or distribute drugs.   Third,
they can be passed between members of a drug conspiracy to allow
substitution when one member leaves the area temporarily.   Since
cellular phone use became widespread, every drug dealer I have
contacted has used one or more cellular telephones for his or her
drug business.   I also know that it is common for drug traffickers
to retain in their possession phones that they previously used,
but have discontinued actively using, for their drug trafficking
business.   These items may be kept for months and months in a safe
place controlled by the drug trafficker.   Based on my training and
experience, the data maintained in a cellular telephone used by a
drug dealer is evidence of a crime or crimes.   This includes the
following:

  a.   The assigned number to the cellular telephone
(known as the mobile directory number or MDN), and the

identifying telephone serial number (Electronic Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are important evidence because they reveal the service provider, allow us to obtain subscriber information, and uniquely identify the telephone. This information can be used to obtain toll records, to identify contacts by this telephone with other cellular telephones used by co-conspirators, to identify other telephones used by the same subscriber or purchased as part of a package, and to confirm if the telephone was contacted by a cooperating source.

b. The stored list of recent received, missed, and sent calls is important evidence. It identifies telephones recently in contact with the telephone user. This is valuable information in a drug investigation because it will identify telephones used by other members of the organization, such as suppliers, distributors and customers, and it confirms the date and time of contacts. If the user is under surveillance, it identifies what number he called during or around the time of a drug transaction or surveilled meeting. Even if a contact involves a telephone user not part of the conspiracy, the information is helpful (and thus is evidence) because it leads to friends and associates of the user who can identify

the user, help locate the user, and provide information about the user.   Identifying a defendant's law-abiding friends is often just as useful as identifying his drug-trafficking associates.

c.   Stored text messages are important evidence, similar to stored numbers.   Agents can identify both drug associates, and friends of the user who likely have helpful information about the user, his location, and his activities.

d.   Drug traffickers increasingly use applications on smart phones that encrypt communications such as WhatsApp, or applications that automatically delete messages, such as Snapchat, in order to avoid law enforcement monitoring or recording of communications regarding drug trafficking and/or money laundering.   Evidence of the use of such applications can be obtained from smart phones, and is evidence of a smart phone user's efforts to avoid law enforcement detection.

e.   Photographs on a cellular telephone are evidence because they help identify the user, either through his or her own picture, or through pictures of friends, family, and associates that can identify the user.  Pictures also identify associates likely to be members of the drug trafficking organization.   Some drug dealers photograph groups of associates, sometimes posing with weapons and showing identifiable gang signs.   Also, digital photos often have

embedded "geocode" or GPS information embedded in them. Geocode information is typically the longitude and latitude where the photo was taken. Showing where the photo was taken can have evidentiary value. This location information is helpful because, for example, it can show where coconspirators meet, where they travel, and where assets might be located

f.    Stored address records are important evidence because they show the user's close associates and family members, and they contain names and nicknames connected to phone numbers that can be used to identify suspects

## VI.   CONCLUSION

32.   Based on the investigation to date, summarized above, investigators believe the above described **Target Residence** is the residence of WATSON. Investigators believe that the intercepted communication discussed herein makes it clear that WATSON is a drug trafficker in Huntington, West Virginia, and is working with Willie PETERSON, Manget PETERSON, and others. Investigators believe that WATSON utilizes his residence to maintain his supply of heroin and/or cocaine, store monetary proceeds from his drug trafficking activities, as well as other items of evidence as further described in Attachment B.

_____
Charles Irwin, Special Agent
Drug Enforcement Administration


SUBSCRIBED AND SWORN before me this 16th day of April, 2018.

_____
HONORABLE Cheryl A. Eifert
United States Magistrate Judge